[Sac. No. 1349. In Bank.—May 9, 1907.]

## BRADLEY S. MOSS, Appellant, v. EDWARD H. JACK, Respondent.

FRAUDULENT CONVEYANCE—FINDINGS NEGATIVING FRAUD—EVIDENCE.— In an action to set aside an assignment and deed executed by the plaintiff to the defendant as having been fraudulently procured, and to recover from the defendant a large sum of money and property obtained by the defendant under the same, it is *held,* upon a review of the evidence, that the findings exonerating the defendant from the charges and imputations of fraud were· fully sustained.

APPEAL from a judgment of the Superior Court of San Joaquin County, and from an order refusing a new trial. W. B. Nutter, Judge.

The facts are stated in the opinion of the court.

Buck & Middlecoff, and Thomas S. Louttit, for Appellant.

Nicol & Orr, and Ansel Smith, for Respondent.

HENSHAW, J.—This is an action in equity to have a certain assignment and deed exĕcuted by plaintiff to defendant set aside, as having been fraudulently procured, and to recover from defendant the sum of fifteen thousand dollars for moneys and property of the plaintiff obtained by defendant under this deed and assignment. The trial resulted in findings wholly exonerating the defendant from the charges and imputations of fraud, and judgment followed the findings in defendant's favor.

The essential facts are the following: Plaintiff is a son, heir, and devisee of William S. Moss, deceased. Upon his death William S. Moss, who was a resident of California, left a will, whereby were appointed as executors of his estate Judge Baldwin and defendant, Jack. Defendant, Jack, had married a daughter of William S. Moss, and is a brother-in-law of plaintiff. Besides property in California, Moss left property and property interests in the state of Illinois, which were, and for years had been, deeply involved in litigation. It is not necessary to particularize in this regard further than to say that this litigation involved the adjustment of partnership accounts, awards to Moss in the accounting, the levy upon and execution sales of pieces of real property, the purchase of them by Moss, appeals resulting in setting aside these decrees, the clouding of the titles so obtained by Moss, affirmance of the execution sales as to certain pieces, and disaffirmance as to others, litigation over this, outstanding liens upon these pieces of property, with resulting confusion and uncertainty as to what would be the ultimate outcome of the litigation. An administrator in Illinois had been appointed to take charge of the property of Moss in the state of Illinois, which property was, of course, first subject to the claims of the Illinois creditors. Jack himself had been the attorney in fact of his father-in-law during his lifetime, and after his death presented to his co-executor, Judge Baldwin, a claim for thir-

teen thousand dollars, ten thousand dollars of which were for services rendered as his attorney in fact, three thousand dollars being for advancements and payments of money. Judge Baldwin, with the consent of all the heirs and devisees, approved this claim, and it was in turn approved by the judge in probate, but thereafter objection having been made by one of the devisees, Jack, with the consent of the court, withdrew his claim for the purpose of presenting it, and it was presented to the probate court in Illinois. Some time before, while Judge McCulloch in Illinois was acting as attorney and adviser for the California executors and the heirs of Moss, Jack, at McCulloch's suggestion, had purchased certain outstanding trust titles which were liens upon the Illinois property, in which the estate of Moss was interested, for the purpose of protecting the Moss interest from loss by hostile and aggressive foreclosure, as in the then uncertain condition of the Moss title or interest, it was extremely doubtful whether it would be expedient for the estate to attempt to redeem from such forced sales,—that is to say, whether its own interests were sufficiently secure to justify these added expenditures. Thus Jack came to have large demands against the property in Illinois, both by reason of his ownership of the trust-deeds, as well as by reason of his thirteen-thousand-dollar claim against the estate. In addition to this, there were other claims filed for approval in Illinois, some of which were unquestionably valid, others of which were doubtful, and there were in addition court costs and attorney's fees for the litigation already had and still pending. In August, 1891, all of the heirs and devisees of Moss joined in the conveyance and assignment to Jack of the Illinois property, and it is this conveyance and assignment which is here attacked for its fraudulent procurement. At the time when plaintiff executed it he was over the age of twenty-five years, and some twelve years passed thereafter before this action was commenced. The specific allegation of fraud charged in the complaint is that on the twenty-ninth day of August, 1891, while Jack was acting as executor of the last will and testament of Moss, he, Jack, requested plaintiff to convey to him the property belonging to the estate of Moss in Illinois, and, acting upon the request of Jack, he joined in

and executed to Jack a deed of conveyance; "that at said time Jack did not inform plaintiff that he had collected said sum of $7,395.14 from Louisa H. McCall, and did not inform plaintiff that he had collected said sum of $1000 from said sheriff, and did not inform plaintiff of the true value of the real property; and plaintiff alleges that the procuring of said conveyance and said assignment from said plaintiff was and is fraudulent as to this plaintiff; that this plaintiff did not know the true description or value of the real property, and did not know that Jack had collected the moneys or had received said rents until within six months prior to the commencement of the action." It is then alleged upon information and belief that at the time of the execution of the deed and assignment there was nothing whatever due to Jack from the estate of Moss, and nothing due to Jack from plaintiff, and that plaintiff received no consideration for the deed.

Without discussion as to whether or not Jack, so far as the property in the state of Illinois is concerned, was chargeable to this plaintiff with the high duty and faith of a trustee, and, indeed, declaring that he was so chargeable, the evidence completely answers and disposes of the specific charges of fraud made in the complaint. Thus, as has been said, it was established that Jack was directly through his claim, and indirectly through his liens upon the property, title to which was claimed by the estate of Moss, a heavy creditor of the estate. It is established that Jack did not collect any sum of money in settlement of the litigation or otherwise from the Illinois property until after the deed and assignment to him by the heirs, and these collections were made under and by virtue of that assignment. It is established that he did not collect the sum of one thousand dollars from the sheriff, except by virtue of the assignment and deed, and it is still further established that the one thousand dollars was a thousand dollars which he himself had advanced to protect the interest of the Moss estate. It is established that the plaintiff did know the true description and value of the real property, not only from the letters of Judge McCulloch in Illinois and the explanations of Judge Baldwin in California, but from a personal visit which he himself made to Peoria, and from examinations and inquiries which he there instituted, and from

CLI Cal.—13

information which he there personally received from Judge McCulloch. Upon every matter of fraud concerning which the complaint speaks, the answering evidence of the defense is full and complete. It establishes, as the court finds, that Judge McCulloch in Illinois, representing the interests of the heirs, wrote frequently at great length to Judge Smith, who was the attorney for the California executors and to the California executors themselves. Judge Baldwin, one of these executors, is dead. But it is abundantly established by the testimony of Judge Smith and of the defendant Jack that the heirs were kept advised with most painstaking care of all the transactions and complications in the progress of the settlement of the estate. Moreover, as to the values of the property, and aside from the finding of the court that plaintiff knew of these values, the court declares that the total amount of property received by Jack under this deed and assignment was $31,443, as against which there were unquestionably, in the shape of encumbrances and undisputed payments by defendant, attorney's fees, taxes, assessments for street work, and the like, claims totaling $25,379.95. With the difference between these sums ($6,063), defendant's claim of thirteen thousand dollars was to be satisfied, in addition to other claims, unquestioned as to their validity, amounting to $896.69, with the disputed claim of one Mrs. Odell of $23,790. Moreover, it does not appear that the heirs placed any reliance upon the representations of Jack in executing this deed and assignment, but, to the contrary, it does affirmatively appear that they placed implicit reliance upon the instructions and advice of Judge Baldwin, the co-executor, who had been William Moss's attorney during his lifetime, and who continued as the attorney and adviser of the heirs after his death. Thus, Mrs. Griffith, a daughter of William Moss, testifying as to the circumstances attending the execution of the deed and assignment, said: "I had known Judge Baldwin ever since I was a child, and I relied upon his statements. His statements in regard to the property in Illinois was that Mr. Jack would not probably get more than was due him; that I had better join in with the other heirs, and he did not think Mr. Jack would ever trouble us any further. . . . Judge Baldwin came to me as a friend, not as an attorney, and advised me to sign these

papers, rather than to have any further trouble with Mr.
Jack; that Mr. Jack would take whatever he might get
there in Illinois, and if he did not get enough to justify his
claim he could come here and recover, but Judge Baldwin
said he did not think he would if we would all sign this
deed, and he so. advised me as a friend, and, having implicit
faith in Judge Baldwin, I did as he told me, as he advised
me. All the Moss heirs were present when the deed was
signed with the exception of Bradley and Billy.'' Mrs.
McDougald, another daughter, testifies: ''We had talked
over with Judge Baldwin the actual condition of the prop-
erty in Illinois and the liens upon it. I can't tell you how
many times, it had been talked over a number of times at
the meetings. I presume Judge Smith was there when the
matter was talked over, although my conversation was usu-
ally with Judge Baldwin. Whatever I asked Judge Bald-
win he advised me.'' Judge Smith testifies that full
information was conveyed to the heirs by himself and by
Judge Baldwin touching all these matters. Upon January
16, 1891, Judge McCulloch from Illinois wrote a letter con-
taining a most elaborately complete statement of the condi-
tion of the Illinois properties. It was addressed to Messrs.
Jack and Baldwin, executors of the estate of Moss, was
received by them, and, indisputably, its contents were com-
municated and explained to the heirs. In that letter Judge
McCulloch writes: ''We have taken everything of a doubt-
ful nature and have put a valuation upon the several items.
fully as high as they will bear. The whole affair can now
be closed up upon the above basis,'' etc. It would seem to
be demonstrated that this charge of fraud, if it is to be
sustained, can be sustained only upon the theory of a con-
spiracy between Judge Baldwin and Jack to swindle the
heirs, since it was upon Judge Baldwin's advice that the
transaction was consummated. Such conspiracy is not
charged, and to entertain the idea of it would strain credu-
lity to the breaking point.

But (and this seems to be the gravamen of appellant's
complaint upon appeal) it is said that a certain provisional
agreement was entered into by McCulloch with Mrs. McCall,
and with Mr. Frazer, who were the principal parties in liti-
gation with the estate of Moss, whereby the litigation was

to be compromised upon a certain basis, and that there is no evidence that the terms of this provisional agreement were made known to the heirs before they executed the deed and assignment. The provisional agreement in itself amounted to little. Mrs. McCall had paid into the bank some seven thousand dollars, the amount of a judgment against her, and of this the heirs had been advised. They had been advised also that it was unwise to accept the amount at that time, lest it might complicate the pending litigation with Frazer. The provisional agreement of July did not change the terms and conditions as to Mrs. McCall. She paid no more nor less than the amount which she had already deposited. It did compromise the litigation with Frazer. Judge McCulloch testifies that the agreement was provisional, because it would first have to be ratified and accepted by the heirs, and that he sent on to California and to the executors the terms and provisions of this agreement, that the heirs might act upon it. It is true that Mrs. McDougald and Mrs. Griffith testify that they were not informed of this provisional agreement, but the plaintiff Moss does not so testify. Indeed, he offers no word of testimony himself to support any of the charges of fraud which he prefers. The testimony of Jack, which was taken by deposition in Florida, contains no specific mention of the matter, and this, for the very obvious reason that this charge of fraudulent concealment is not preferred in the complaint. His examination was directed to the fraud actually charged, and his deposition completely covers these matters. It is not surprising that he did not testify in reference to a matter concerning which he was in no way advised that he would be attacked. Judge Smith, though living, was not present at the conference whereat these matters were made known to the heirs, and whereat by Judge Baldwin they were advised to execute the deed. Judge Baldwin himself, as has been said, had died. The testimony, however, shows generally that the heirs were kept fully advised upon all matters touching their interest. It is unquestioned that Judge Baldwin knew of the compromise agreement. It is proved out of the mouths of plaintiff's witnesses that Judge Baldwin advised the execution of the deed and assignment to Jack, with this knowledge, and, excepting, as we

have said, upon the highly improbable theory that Judge Baldwin was a corrupt conspirator to defraud his clients, as it was upon his advice they relied, it will not be concluded that upon this point the charge of fraudulent concealment has been established by convincing evidence, or at all.

The court's findings declare not only the fairness of the transaction, but the payment of a full price, and we see no reason why these findings should in any respect be disturbed.

None of the rulings of the court in admitting or rejecting evidence calls for particular consideration, and for the foregoing reasons the judgment and order appealed from are affirmed.

McFarland, J., Shaw, J., Angellotti, J., Sloss, J., and Lorigan, J., concurred.